AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Northern District of Oklahoma

FILED

DEC 20 2018

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| United States of America | ) | |
| --- | --- | --- |
| v. | ) | Case No. 18-MJ-179-JFJ |
| Hongjin Tan | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____12/12/2018_____ in the county of ___United States of America___ in the
___Northern___ District of ___Oklahoma___ , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| Title 18, U.S.C. 1832(a)(2) | - Theft of Trade Secrets |

This criminal complaint is based on these facts:

See attached affidavit in support.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Jeremy Sykes, SA/FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 12-20-18, 3:35pm

_____
_Judge's signature_

City and state: ___Tulsa, OK___

US Magistrate Judge Jodi F. Jayne
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF COMPLAINT

1. I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since August of 1995. I am currently assigned to the Oklahoma City Division's Joint Terrorism Task Force, where I investigate multiple violations of Federal law, to include the investigation of economic espionage and theft of trade secrets. I have gained experience in conducting these investigations through training, seminars, and day-to-day work related to investigations of this type.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## DESCRIPTION OF COMPANY A

3. Company A is a large international independent energy and petroleum corporation whose business focuses on exploration and development of petrochemical products and by-products and exploration and development of oil and natural gas. Company A's technology is critical to its business.

4. Company A protects its proprietary technology and processes through a multi-layered strategy involving both physical security as well as password protected entrance into varied computer systems.

## COMPANY A'S PROPRIETARY TRADE SECRET INFORMATION RELEVANT TO THIS AFFIDAVIT

5. Company A has a research facility in the Northern District of Oklahoma. Company A sold and shipped, and intended to sell and ship, a specified Research and Development Downstream Energy Market Product (hereafter referred to as Product A). Company A has a facility in the Northern District of Oklahoma that is one of two refineries in the world to manufacture Product A.

6. Company A has advised the FBI that the company has earned an estimated $1.4 to $1.8 billion from its sale of Product A. Company A considers its methods of developing Product A to be trade secrets. The economic value of Company A's methods of developing Product A is tremendously significant and of great value to competitors.

## HONGJIN TAN

7. On 04/21/2017, Company A hired Hongjin Tan, a citizen of The People's Republic of China (now a Legal Permanent Resident of the United States), as a research engineer in Company A's battery development group in the Northern District of Oklahoma. Among

1

other things, Tan was responsible for research and development of Company A's battery program operation, with the purpose of developing battery technology using Company A's proprietary processes.

8. Based on the resume Tan provided to Company A when he applied for employment, Tan received a Bachelor of Science Degree in Physics from Nanjing University in Nanjing, China (2006) and a Master's Degree and Doctorate Degree from the California Institute of Technology in Pasadena, California (2011).

## COMPANY A CONTACT WITH THE FBI

9. On 12/13/2018, at approximately 12:19 p.m. Eastern Time, a Company A representative called the FBI to report the theft of trade secrets. The Company A representative provided the below information.

10. On 12/12/2018 at approximately 10:30 a.m., Tan contacted his supervisor, advised he was resigning from Company A, and gave his two weeks' notice. Tan told his supervisor that he was returning to China to be with his family as he is the only child to aging parents. Tan told his supervisor that he did not currently have a job offer, but was negotiating with a few battery companies in China.

11. Tan's resignation prompted Company A to revoke his access to company systems, and conduct a Systems Access review of Tan's computer activity.

12. That review confirmed that Tan had accessed hundreds of files, including research reports. The reports included not only how to make Product A, which, according to Company A, is a complicated and technically difficult process, but also Company A's plans for marketing Product A in China and in cell phone and lithium-based battery systems. These files included information that Company A considers to be trade secrets and outside the scope of Tan's employment with Company A. The review revealed Tan downloaded restricted files to a personal thumb drive. In the course of his regular duties and responsibilities, Tan should have used his company issued laptop. Tan did not have authorization to use a thumb drive to download Company A files. Tan's supervisor confirmed that nothing in the downloaded files was within Tan's area of responsibility. Further Company A confirmed, through Tan's supervisor, Tan did not have a work related need to access or download the restricted files.

13. Based on that information, Company A officials escorted Tan from Company A property and barred him from returning.

14. Tan's supervisor then located Tan and escorted him to the supervisor's office.. Tan was advised that he would not be allowed to come to Company A to finish his two weeks of notice employment and was to leave Company A's property immediately. Tan was allowed to retrieve his personal bag, after it was searched, and keys before he left.

15. Later that day, on 12/12/2018 at approximately 4:00 p.m., Tan sent the following text message to his supervisor:

> **. . . [Another Company A supervisor] was asking if there is anything I have with me associated with company IP. I have a memory disk that contains lab data that I plan to write report on, and papers/reports I plan to read at home. Now that I have been exited from (COMPANY A), can you check what is the best way of handling the information and how sensitive they are? Can I still read the papers/reports from the memory disk?**

16. After receiving the above text from Tan, Tan's supervisor asked him to return the flash drive (which Tan's text message referred to as a "memory disk") to Company A.

17. At approximately 5:15 pm on 12/12/18, Tan returned to the Research Technology Center at Company A where he provided a USB flash drive to his supervisor. The USB flash drive was Tan's personal property, which he was not authorized to utilize within Company A's space. There is no record of Company A having issued a USB flash drive to Tan.

## EVALUATION OF POTENTIAL LOSS OF COMPANY A'S TRADE SECRET INFORMATION

18. Upon reviewing the USB flash drive, Company A determined the following:

- the USB flash drive that was in Tan's possession outside of Company A's control contained data files that were owned solely by Company A, and;

- data on the USB flash drive that was in Tan's possession (in deleted and undeleted files) contained research documents which would have a tremendous impact to Company A in terms of technological and economic loss if they were to be shared or given to a competing company. Each page of the accessed document(s) was marked "confidential" and "restricted".

19. The review further revealed that the files were deleted on 12/11/2018, the day before Tan's resignation. Using commercially-available software, Company A recovered and reviewed the deleted files. Company A determined the disclosure of information in documents located on the USB Flash Drive would allow Company A's competitors with the technical knowledge and process to manufacture Product A.

3

## DESCRIPTION OF TAN'S CONTACT WITH COMPETITOR OF COMPANY A

20.    On 12/13/2018, Tan had dinner with a former co-worker from Company A. During this dinner, Tan told the co-worker he was leaving Oklahoma on 12/27/2018 to return to China. Tan told the co-worker that when he went to China in September 2018, he interviewed for a Chinese company (hereafter referred to as Company B) and had been in constant contact with the company since he was in graduate school at The California Institute of Technology.

21.    The following day (12/14/2018), the co-worker reported the conversation he had with Tan at dinner to a Company A official.

22.    According to the public website for Company B, the company is located in Xiamen, China. According to the online company profile (which is available in Chinese and English) for Company B, the company has "developed two production lines so far, one for Li-ion battery cathode materials (such as lithium cobalt oxide, ternary cathode material, lithium manganese oxide, lithium iron phosphate, etc.) and the other for NiMH battery anode material (Hydrogen storage alloy)."

## TAN'S FOREIGN TRAVEL

23.    Affiant has located international travel records for Tan from the United States (U.S.) Customs and Border Protection and U.S. Department of Homeland Security. These records confirm that on 09/15/2018, Tan traveled from the Dallas/Ft. Worth, Texas International Airport to Peking, China and arrived at the Beijing, China Capital International Airport. Tan's travel records also confirm that on 09/30/2018, he returned to the Dallas/Ft. Worth, Texas International Airport via the Beijing, China Capital International Airport.

## COMPANY A'S PROTECTION OF ITS TRADE SECRETS

24.    Company A's methods of developing Product A were protected by Company A as confidential and proprietary information. Company A considers this information to be a trade secret (hereinafter referred to as the Trade Secret Information), which was used in products sold and distributed in interstate or foreign commerce.

25.    Company A used a number of reasonable measures to protect the Trade Secret Information and its other confidential proprietary information, including the following:

-    Company A restricted access to the controlled environment in Oklahoma where the Product A and battery research were conducted behind locked doors with magnetic card readers, and only certain employees were granted access;

4

- Company A limited access to the Trade Secret Information to those who needed it to perform their employment duties;

- Company A prohibited distribution of research products to other companies, persons, or countries or for research;

- as a condition of their employment, Company A employees executed non-disclosure and assignment agreements, which specifically referenced Company A's confidential and proprietary information.

26.     Company A implemented data security policies stipulating that all information created, sent, received, or stored on Company A's electronic resources was company property and that all activity on Company A's electronic resources was subject to monitoring. Furthermore, these policies prohibited employees from transmitting, receiving, or storing company information outside Company A's electronic resources.

27.     Affiant believes Tan was aware of Company A's measures to protect their Trade Secret Information due to the agreements he signed with Company A pertaining to Confidential Information, Non-Disclosure and Intellectual Property.

28.     As an example, in the Confidential Information, Non-Disclosure and Intellectual Property Agreement signed by Tan on 06/19/2018, Tan agreed, among other things, that;

- without prior written consent of Company A, he would not "disclose, use, reproduce, or transmit (except for the performance of his duties for Company A), or permit the unauthorized disclosure, use, reproduction or transmission of any Confidential Information during the period of his employment with Company A or at any time thereafter";

- he would not "upon leaving the employ" of Company A, take with him any records, memoranda, drawings, pictures, models, papers, notebooks, reports, computer disks or other similar media having Confidential Information in or on such media.

29. Additionally, Affiant believes Tan was reminded of his obligation, per signed agreement, with Company A when he would log in to his work computer.

30.   For example, when an employee of Company A begins to access their computer at work, the following warning appears on a screen banner before the employee can log in:

**This is a private computer system to be accessed and used for (Company A) business purposes. By accessing, using and continuing to use this system or device, you agree to the terms of use. All access must be specifically authorized and used only in accordance with all applicable (Company A) policies. Unauthorized access or use of this system is prohibited and may expose you to liability under criminal and civil laws. Absent a separate written agreement, all**

5

non-personal information and content you create, store or collect on behalf of (Company A) or in the scope of your employment, on this computer system is the sole property of (Company A). To the extent permitted under local law, (Company A) reserves the right to monitor, access, intercept, records, read, copy, capture and disclose all information received, sent through or stored in this system or device, without notice, for any purpose and at any time.

31. After the Company A employee successfully logs into Company A's computer systems, the exact same warning appears on the computer screen under the heading "**LEGAL NOTICE**".

32. Heilbrun also advised it is not possible to successfully activate Company A's VPN without seeing the above described warning banners, along with other warnings.

## EMPLOYMENT OFFER FROM COMPANY B

33. On 12/19/2018, Tan's laptop computer that was issued to him by Company A was forensically examined by technically trained FBI computer analysts. In the examination, a document was located that had been scanned into the laptop, which was a letter written in the Chinese language.

34. This letter was bearing a stamped logo of name of Company B and was dated 10/15/2018. At the bottom of the letter is a signature and the date of 10/17/2018.

35. An image of this letter was submitted to an FBI Chinese linguist who roughly translated the text of the letter as follows:

**This is a Position Hiring Agreement**

**It states Mister TAN Hongjin will be the Energy New Material Engineering Center Director [LT] in Xiamen. The letter includes his responsibilities in the management portion as well as his expertise area. TAN's annual salary will be 800,000 RMB. A soon as he starts, he will be compensated 400,000 RMB for introducing the talent. While you [TAN] are signing the contract, you must guarantee that the information you have already provided and will provide is real and effective; there is no false [information][verbatim translation]." TAN must promise the confidentiality that he has not [released] to a third party of the company technology and operational related information. TAN must sign the agreement before 10/20/2018, and the agreement becomes valid [on] 1/1/2019.**

36. Affiant interprets the letter to mean Tan has been offered a position with Company B in Xiamen, China, he has provided the company with "talent" that he is being paid 400,000RMB (approximately $58,000 USD) for, and he must guarantee the information he provided is real and effective, in addition to guaranteeing he has not provided it to a competing company. Affiant also interprets the letter to mean Tan is

being given a substantial position with Company B for a 800,000 RMB salary (which is the approximate equivalent of $116,000 USD).

37.    Affiant also notes the employment offer from Company B was made following his trip to China on 09/15/2018. Additionally, in his exit interview, Tan provided personnel at Company A with false information, stating that he was returning to China to take care of his parents and he did not yet have employment, despite his offer of employment with Company B.

38.    On 12/19/2018, United States Magistrate Judge for the Northern District of Oklahoma authorized a search warrant for Tan's residence. That warrant is being executed at the time of the preparation of this Affidavit.

39.    Affiant has been notified a USB thumb drive has been located in Tan's house which contains documents belonging to Company A. The Risk Assessment of these documents is currently underway.

For the reasons stated above, Affiant submits there is probable cause to arrest Hongjin Tan for violations of 18 U.S.C. § 1832(a)(1), (a)(2), and (a)(3) (Theft of Trade Secrets).

Respectfully submitted,

James Clinton Judd
Special Agent FBI

Subscribed and sworn to before me this 20th day of December 2018.

Honorable Jodi F. Jayne
United States Magistrate Judge